THE PEOPLE v. DANIEL F. WADSWORTH.

*Embezzlement—Intent to defraud.*

There can be no embezzlement under our statutes where there is no *intent* to defraud.[1]

So *held*, in a case where a city treasurer, conformable to a practice of long standing and well known to the business community, arranged with a bank to collect and disburse the city taxes, and pay him the statutory fees, and to receive for its trouble and expenses the profits accruing from the use of the money in its business. The bank carried out the agreement in good faith, until forced to make an assignment for the benefit of its creditors, and then turned out to the city money and paper to cover a portion of the balance due, the entire transactions being marked by good faith by all parties interested.

*Held*, further, that on such deposit the money ceased to be the property of the treasurer, and became that of the bank, which became obligated to refund to the city or its treasurer, on demand, any balance that might be due, not in the same identical money deposited, but in the funds of the bank.

Error to Delta. (Grant, J.) Argued October 27, 1886. Decided November 4, 1886.

Information for embezzlement. Respondent convicted. Reversed, and discharge ordered. The facts are stated in the opinion.

*E. E. Osborn*, for respondent.

*Moses Taggart*, Attorney General, for the People.

MORSE, J. The respondent was convicted of embezzlement upon a trial in Delta county, a change of venue having been taken to that county from Marquette, where the information was filed and the alleged offense committed.

[1] See *People v. Hurst*, 62 Mich. 276.

The information consisted of two counts,—one attempting to charge the defendant with the embezzlement of the money of John Dillon, and the other charging him with such embezzlement as the *de facto* treasurer of the city of Ishpeming. The trial proceeded upon the theory of the first count.

While no objection seems to have been raised in the court below to the information, we have been unable to find any allegation or averment in the first count that the moneys alleged to have been embezzled were the moneys of John Dillon. From a careful examination, one of two things may be inferred, namely, that the moneys either belonged to the Cleveland Iron Mining Company or to the city of Ishpeming; but there is not the slightest intimation that such moneys belonged to John Dillon, nor can any legitimate inference to that effect be drawn from the language of the information. But as the case will be disposed of upon the merits, the information need not be further discussed.

The undisputed facts will be found to disprove any embezzlement under the law.

John Dillon was elected city treasurer of Ishpeming for the year 1883. He had held the office two terms immediately previous thereto. It seems that a peculiar method of electing this officer prevails in Ishpeming.

The candidate is nominated and elected upon his running qualities,—his capacity to get votes,—but the money to secure such nomination and election is put up by some bank, which also furnishes the bonds. After the election, the candidate elected qualifies, and there his duties begin and end. The taxes are paid into the bank, and collected and disbursed by it. The treasurer has no further concern about the matter, and is, of course, entirely ignorant of the duties of his office. The bank pays to him the fees allowed by law, and the profits made by the use of the money thus necessarily deposited in the bank seem to be a sufficient remuneration to the bank for its trouble and expense in the matter.

Nobody can suffer any material loss under this arrangement except the public. While it may seem a novel method, it certainly relieves the treasurer of a great responsibility, and renders his administration of the office an easy one, with the same pay as if he performed the duties himself; and the bank fortunate enough to elect its candidate presumably has the means thereby at hand to repay its election expenses, and make a handsome profit besides.

John Dillon testifies that he knew absolutely nothing of the duties of his office, although he had been treasurer for nearly three years. The first two terms of his office he was elected and served the people in the manner above indicated, and all seemed to go on well. Wadsworth collected the money and kept the books.

" I suppose Wadsworth was to account to other people who were entitled to the tax money. I was not to do anything myself. I did not know anything about the duties of city treasurer. I trusted Wadsworth to perform the duties required of the city treasurer. I was elected. Mr. Wadsworth got my bond. I did not do anything then about assuming the office. I did not receive any books or any money. I suppose Mr. Wadsworth received them."

The respondent during these years was the managing member of the banking house of D. F. Wadsworth & Co., private bankers. During the first two terms of Dillon's office the funds received by respondent's bank were deposited in the bank the same as other moneys deposited by its customers, and mingled with them. The tax moneys were not kept or deposited as a separate fund, not to be used by the bank save for legitimate tax purposes, but became at once a part of the common cash funds of the bank, to be used and paid or loaned out the same as other moneys. Indeed, the bank could have no possible object in entering into such an arrangement as was made, unless it could use the tax money in any way it chose until it was wanted for the purposes for which it was levied. Dillon and the whole business community well under-

stood the use that was being made of this money, and that it was not kept separate from the other funds of the bank, or intact.

When Dillon was elected the third time, he testifies he made the same arrangement. The money was to be kept and used as before. It was so kept and used.

Unfortunately, however, for the city, the bank of D. F. Wadsworth & Co. did a losing and unprofitable business in the year 1883. In the afternoon of December 29, 1883, between the hours of 3 and 5 P. M., the Cleveland Iron Mining Company paid its taxes into the bank, to wit, $11,942. This money was nearly if not all paid out to other depositors on Monday, the thirty-first. On the second of January, 1884, the bank made a general assignment for the benefit of its creditors. At the time of the failure the bank was owing the city about $30,000. The respondent turned out to the mayor of the city $1,902.05 in currency, and $6,800 in good paper,— notes. The mayor testifies that—

"Wadsworth offered a good deal more than that. I took what paper I could negotiate, and sell and convert into money, and put into the treasury. I did not take any more, because I could not make any disposition of it, and I thought it would be of no use."

It appears without question that the moneys collected or paid in from taxes were deposited on an account called "City Taxes," and, after the taxes were all in, the books were balanced up in the business, and everything credited to this account, and the balance due the treasurer was credited to an account called "City Treasurer's Account." The moneys were deposited the same as any other deposits, as soon as collected, and mingled with other funds. The bank held itself liable to the city treasurer for that amount. This had been the practice for years, and with other treasurers before Dillon.

It is shown by the testimony of William H. Rood, the mayor of Ishpeming, who had been at one time connected with the

respondent in the banking business, that before the failure of
D. F. Wadsworth & Co., and in the fall of 1883, the Mar-
quette County Bank had been organized to take the place of
the bank of D. F. Wadsworth & Co., and succeed to its busi-
ness. Wadsworth was made one of the directors of the new
bank. It was organized for the express purpose of putting in
fresh capital, and carrying on the business of D. F. Wads-
worth & Co. The funds and paper of the old bank were to
be turned over to the new bank, and such new bank was to
assume and pay all the liabilities of the old bank, as far as
the assets of the old bank would go.

" The understanding was that his open accounts, subject
to check, including the city treasurer's account, were to be
assumed by us [the Marquette County Bank], and the certifi-
cates of deposit were to be left, to be settled by him as he
could out of his assets."

On the first day of January, 1884, Rood and Nelson, the
cashier of the Marquette County Bank, went into Wads-
worth's bank for the purpose of completing the proposed
transfer. They made a careful examination of Wadsworth's
books, found his bank in a worse condition than they had
supposed, and therefore refused to make such transfer. Mr.
Rood then told Wadsworth that the only thing he could do,
in justice to his creditors, was to make an assignment at once.
Wadsworth strongly objected to it at first, " and said it was
nonsense, in the condition he was in." Rood further testifies
" it was only after a long argument that I convinced him it
must be done, and I insisted on his doing so."

From this, and all the other evidence, it clearly appears
that Wadsworth received and kept and used this tax money
in the business of his bank, the same exactly as he did all the
other moneys deposited with him in the usual course of his
business; that he supposed, and had reason to suppose, that
he had a right to use this money as he did the other moneys;
that he believed, and had reason to believe, when he received

this particular sum of nearly $12,000, that the whole obligation of his bank to the city treasurer, including this sum with the rest, was to be assumed and paid by the Marquette County Bank, a solvent institution; that he had not the least idea of his own failure, or that he would be forced to make an assignment; that he only made the assignment because of the failure of the arrangement of transfer, and the insistence of the mayor of the city, who assumed to represent that municipality as a creditor of the bank, that he should do so, and that at once. He endeavored to pay and secure the city, as far as he could. In other words, the intent to defraud the city, or any one else, is absolutely wanting. His character up to the date of his failure, in the language of the mayor, had "always been excellent," for a series of years. "I never knew of his doing a mean or dishonest act."

There can be no embezzlement under our statutes where there is no intent to defraud. There are cases where one uses the money of another as he has no right to use it, and thereby converts and appropriates it to his own use, in which the statute will infer a fraudulent intent, and punish the act as an embezzlement.

But such is not this case. When the money was deposited or taken into the bank under the practice of years, and by the arrangement with Dillon, the money ceased to be the property of Dillon, and became the money of the bank. The respondent became obligated to refund to the city or to Dillon, when called for, any balance that might be due, not in the same identical money deposited, but in the funds of the bank. The relation of debtor and creditor was established. The money deposited was loaned to the bank, to be repaid when called for. Wadsworth, in paying out the funds deposited to pay taxes, in the usual course of his business, only did what he was in effect authorized to do by Dillon. That the city has lost its tax levy is as much the fault of Dillon as of Wadsworth.

There is no evidence tending to show that Wadsworth used a dollar of this money for his own private gain or advantage. The circuit judge who presided at the trial, and heard all the testimony, in sentencing Wadsworth to a fine of $500, said:

"I cannot, however, under the circumstances, bring myself to believe that there was that degree of criminality in you that there is in the man who deliberately takes money with the intent to appropriate it to his own use. I have no doubt that you did not profit by that transaction. I have no doubt you paid the money out as testified to,—as is shown by the books."

If the respondent in this case is guilty of embezzlement, then any debtor who borrows money on the faith and belief that he can repay it, and by misfortune in business is unable to do so, is guilty of the like offense.

It is claimed upon the part of the prosecution that there was evidence tending to show that some time after the assignment the respondent obtained possession of a book, used as a cash blotter in his bank, and changed the last leaf of the same, being the entries for December 29 and 31. It was admitted, however, that the change did not affect the books of the bank, nor did it show any different amount of cash on hand for December 31. One witness testified:

"The cash blotter, as it now stands, shows on hand just the same amount of money on December 31 as it did before. *   *   As it now stands, it corresponds with the bank books very nearly,—didn't before."

The only change claimed under date of December 31 was that the blotter, as claimed to be altered, had the cash items entered separately, and added up, while before it only gave the same amount as a total, without itemizing. The change for that date, if any, made no difference in the result of the statement for that day. For the twenty-ninth, it is claimed that before alteration the statement showed the amount of the taxes paid in by the Cleveland Mining Company, on

that day,—some $12,000 more cash on hand than it now shows.  As the blotter is claimed to have stood on the twenty-ninth, and before alteration, it did not agree with the books or cash balance.  · It showed the cash ahead between $11,000 and $12,000, the amount of this company tax.

This cash blotter is no part of the bank books, but simply a memorandum for the cashier or teller.  This matter is very easily explained.  These taxes, though paid on the twenty-ninth, were taken in so late that they were not entered on the books of that date, but as of the thirty-first, the thirtieth being Sunday.  If the amount of this tax did appear on the cash blotter for December 29, and the book has since been changed so that it does not now appear, such change could have no tendency to show respondent's guilt, for the simple reason that this sum of nearly $12,000 was not carried into the business of the bank until the thirty-first.  There was upon the trial no pretense that any one paid any other $12,000 into the bank on the thirty-first.

No matter what change was made in the blotter, the fact is patent, and must be admitted beyond cavil, that the money for this Cleveland Iron Company's tax, although paid in on the twenty-ninth, was not credited upon the books of the bank until the thirty-first, and that the blotter, as it once was and now is, shows the same transaction upon that date.  To make the alleged change of any value, as testimony against respondent, it should have had some tendency to show that he had received this $11,000 or $12,000 shown by this discrepancy from some source, and had concealed and appropriated the same to his own use.  It had no such tendency.  No one pretended on the trial but what the books of the bank, as to receipts and disbursements, made a true statement of the same.

The principal argument used upon the trial, and in this Court, to establish the guilt of the respondent, was that, before this money was received and paid out by the bank,

William H. Rood, the mayor of Ishpeming, requested the respondent to keep the tax moneys separate from the other funds, and he agreed to do so.   Mr. Rood testifies:

" I asked him at that time if he would receive the money, and keep it separate from the other funds, and he said he would do so.   There was nothing said about his abstaining from the use of the money more than that."

He further testifies as follows:

" Mr. Wadsworth came to me along the latter part of the month [December], and said that he desired to use some of these funds, and, after some talk with him, I consented to it as far as I could, provided he would put in its place some good paper,—paper I could approve of.   *   *   I did not say how much he might use.   He spoke of using a portion of it, and I said he might.   *   *   He said he wanted to use some portion of the funds, and I said he might do that."

On cross-examination he further testified that Wadsworth told him in this conversation that he did not propose to take any more drafts for taxes, some drafts having been protested; he wanted to use the money.   He said he had sent on these drafts for collection, they had been protested, and he had drawn against them in the course of business, and he must use some funds to send on to replace them.

" There was no stipulation as to the kind of paper he was to put in the place of it, any more than it was to be good paper.   *   *   I suppose he understood what I said."

This agreement made with the mayor cannot be considered as a condition upon which he received this money.   It is not shown that this 11,000 and odd dollars was paid in because of this agreement.   Mr. Wadsworth received this money by virtue of his arrangement with John Dillon, the city treasurer, and was responsible to him, if any one.   Under the arrangement with Dillon, he was to use the money.   The request of the mayor, and Wadsworth's agreement, to have the funds kept separate, could in law have no bearing upon a charge of embezzlement of money belonging to John Dillon, unless it

might tend to show a fraudulent intent in the disposition of the moneys contrary to such request.

As before shown, the evidence entirely rebuts any such intent. He supposed that the open account in favor of the city was to be assumed on the first day of January by the Marquette County Bank. The circuit judge but voiced the whole import and tenor of the evidence in this case when he told the respondent, in substance, that he did not think he profited out of this transaction, or took the money with the deliberate intent to appropriate it to his own use.

The case is one of a failing debtor borrowing money of one to pay a loan to another, with the reasonable hope of being speedily able to meet all his obligations. This is not the case where one, in violation of the law, or of his duty to his employer, uses money not his own, and which he knows he has no right to use, in speculation for his own profit, or in pandering to his appetites, or love of luxury, with the hope of being able to replace it before its use is discovered, and concealing the taking of it by false entries, or otherwise.

It is a case where a banker, known to be doing business, in part at least, upon the profits arising from the use of the deposits in his bank, is unable to meet his obligations, and fails. The depositor in such a case is a creditor of the bank, and there is nothing about his relation with the bank that can make its failure an embezzlement of the funds he has voluntarily placed there in the usual course of business, without any special agreement that his money shall be kept separate from the other funds, and not used as are all general deposits. Deposited without such agreement, he parts with his title, and loans his money to the bank. The bank, therefore, cannot embezzle his money, because he has none in its hands. The bank owes him a certain amount, to be paid when called for. A mere failure to pay a loan can never be an embezzlement.

The respondent should have been acquitted, upon the

evidence, by the direction of the court below. The judgment against him is reversed, and he will be discharged from any further custody, under the information filed against him in this case.

The other Justices concurred.