NOYES S. COLLINS, PLAINTIFF IN ERROR, VS. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

EMBEZZLEMENT BY BANKERS—STATUTES CONSTRUED—NO LIMITATION AS TO TIME FOR TAKING WRITS OF ERROR IN CRIMINAL CASES.

1. The purpose of Section 2972 R. S., providing that writs of error in criminal cases shall be *issued* and made *returnable* as the like writs in civil cases, was *not* to adopt for criminal cases the period of limitation prescribed by Section 1271 R. S., for the suing out of such writs in civil cases; the former section intended only to provide that the *mode* and *manner* in which such writs are *issued* and made *returnable* shall be the same in both civil and criminal cases, as is provided for by Section 1270 R. S. There is not now and has never been any limitation of time within which writs of error to this court from judgments of the Circuit Courts can be sued out in *criminal cases*.

2. Deposits by the customers or clients of a commercial bank therewith are of two classes, *viz: special* or *specific*, and *general*. When the identical money or other thing deposited is to be restored, or is given to the bank for some specified and particular purpose, as to pay a certain note or other indebtedness, or is received by the bank as a collecting agent, such collection to be remitted, such deposits are special or specific, and the *property* in the deposit remains in the depositor, the bank in such cases becomes the bailee, trustee or agent for the depositor. General deposits in a commercial bank comprise all moneys that are simply deposited therewith on account of the depositor without being complicated by any other transaction than that of

the depositing and withdrawing of the moneys by the customer from time to time. Such a deposit transfers the ownership of the money to the bank, and the relationship with reference thereto as between the bank and the depositor is simply that of debtor and creditor at common law. The original and every subsequent general deposit is in strict legal effect a loan by the customer to the bank.

3. Section 27, p. 362 McClellan's Digest, that inhibits *the use*, concealment, or wilful withholding by any banker of the money or property of another that may have been received by such banker on deposit, was not intended to annul the rules of law fixing the status between bankers and their customers, or to prohibit the use in his business by the banker, in a legitimate way, of moneys deposited *generally* with him, and for which he becomes the debtor of the depositor. When the banker uses the moneys deposited *generally* with him by his customers, and for which he becomes the *debtor* of such patrons, in his legitimate business, his subsequent failure or inability to repay the amounts of such indebtedness, brought about by legitimate but injudicious speculations, loans or investments, without other fault upon his part than want of good judgment, energy or enterprise, he can not be reached criminally under this statute. The purpose of this statute was not to interfere with the well-settled right on the part of the banker to deal with his *general* deposits as though they were his own, but was intended to prohibit and prescribe punishment for the use, concealment or wilful withholding by the *individual* or *private* banker of any money or property that may have been deposited with him as a *special* or *specific* deposit under such circumstances as will continue the *ownership* of the deposit *in the depositor*, and that constitutes the banker the bailee, agent or trustee thereof for the depositor.

4. Under said Section 27 of the statute, the officer, agent, clerk or servant of any incorporated company, or the clerk, agent or servant of any private person or copartnership, or the officer of any incorporated bank, can not be reached for the wrongful use or conversion of the property either of his corporation or employer or of property that his corporation or employer holds in special deposit as bailee, trustee or agent; Sections 28 and 29, page 362 McClellan's Digest being particularly applicable to them.

Writ of Error to the Circuit Court for Columbia county.

The facts in the case are stated in the opinion of the court.

*R. W. & W. M. Davis, B. Putnam Calhoun, Blackwell & Reese* and *W. M. Ives* for Plaintiff in Error.

*William B. Lamar, Attorney-General,* for the State.

TAYLOR, J.:

The writ of error in this cause was applied for and issued after the lapse of six months from the judgment of conviction from which it was taken. Upon a motion to dismiss before this court on behalf of the State it was contended that under Section 2972 of the Revised Statutes, that provides as follows: "Writs of error in criminal cases shall issue as of right, and shall be issued and made returnable as the like writs in civil cases," the writ should be dismissed because it was not sued out and taken within six months, that being the time limited by Section 1271 of the Revised Statutes within which such writs can be sued out in civil actions. The motion was denied, the court being satisfied that the said Section 2972 of the Revised Statutes intended to provide, as its language expresses, only for the *mode* and *manner* in which such writs in criminal cases shall be *issued* and *made returnable*, *viz:* in the same manner as the like writs are issued and made returnable in civil cases as provided for in Section 1270 of the Revised Statutes; and that it was *not* intended thereby to adopt the period of limitation

provided by Section 1271 for the suing out of such writs in civil actions, or any period of limitation whatever. Said Section 1271 does not undertake to prescribe the mode or manner of *issuing* such writs in civil cases or for their *return*, but is an independent section prescribing a period of limitation alone in which such writs can be sued out in *civil* causes, and is not applicable to like writs in *criminal* cases. There is not now and has never been any limitation of time within which writs of error to this court from judgments of the Circuit Courts in *criminal cases* can be sued out.

Noyes S. Collins, the plaintiff in error, was indicted at the Spring term, A. D. 1892, of the Circuit Court of Columbia county as follows, omitting the formal introductory part of the indictment: "That N. S. Collins, late of said county, laborer, on the 8th day of July, A. D. 1891, at and in the county, circuit and State aforesaid, being then and there a banker, to-wit: the president of the Lake City Bank, in said county and State, did then and there receive on deposit money to-wit: the sum of forty-three dollars and fifty cents, belonging to another, to-wit: to William Watts and J. S. Taylor, partners at that time doing business under the firm name and style of Watts & Taylor, and did then and there use, conceal and wilfully withhold the same from the said Watts & Taylor so as to prove a defaulter therein, and did then and there become a defaulter therein, contrary to the form of the statutes in such cases made and provided."

Under this indictment the defendant was tried at the Spring term of the court A. D. 1893, and convicted, and upon the overruling of his motions in arrest of judgment and for a new trial, was sentenced to imprisonment in the county jail of Columbia county for

a period of six months, and from such judgment takes error here.

From the evidence furnished us in the record it becomes apparent that the indictment was framed, and that the trial and conviction of the defendant was had upon an entire misconception of the law applicable to the relations existing between bankers and their depositors, and of the scope, purpose and intent of our statutes relative to the crime of embezzlement or misappropriation of moneys by persons doing the business of bankers, and it, therefore, becomes unnecessary for us to discuss the particular errors assigned, since none of them point out specifically the errors of the conviction had. The evidence in full was as follows: W. F. Watts for the State testified that he resided in Lake City, Columbia county, Florida, in the year 1891, and was a depositor in the Lake City Bank, as a member of the firm of Watts & Co. This firm was composed of myself and J. S. Taylor; the firm was advertised as W. F. Watts & Co.; that was the style of the firm. We had it on cards and letter heads and papers. There was no other firm in town composed of W. F. Watts and J. S. Taylor. I do not know that it was known to N. S. Collins that J. S. Taylor was the member of the company. He was generally known as such. I made the deposit of $43.50 in person in the Lake City Bank in the name of W. F. Watts & Co., between 1 and 2 o'clock on the day the bank closed, which was the 8th day of July, 1891. The bank closed at 2 p. m. and never opened again. It was nearer 2 o'clock than 1 o'clock when I made the deposit. I made out a slip or ticket of the deposit and handed it to Mr. Collins who received it at the window. The ticket is in my hand-writing. The ticket which

28

is read in evidence I identify as the one I made out and handed to N. S. Collins. I left my bank-book at the bank afterwards, and got it a day or two afterwards, after the bank failed, and in it I found entered to my credit $43.50, July 8th, 1891. My balance when the bank failed I found to be $104.83. I mean due to W. F. Watts & Co. The deposit slip testified about is as follows: "Deposited in the Lake City Bank by W. F. Watts & Co., July 8th, 1891—Bank Notes 20 Dollars——cents, Gold——, Silver 23.50, checks——, $43.50." The entries in the bank-book testified about are as follows: "Lake City Bank, Lake City, Fla., In account with W. F. Watts & Co. Dr. Lake City Bank in account with W. F. Watts & Co.

| 1891—July 6 | $55.00 |
| July 8 | 43.50 |
| To Balance | 59.70 |
| | $158.20 |

| Balance | $104.83 |
| CR. | |
| July 6 | $10.00 |
| July 7 ........ $4.37—$39.00 ..... | 43.37 |
| July 10, '91 Balance | 104.83 |
| | $158.20 |

I did not make demand for my money until some time after the bank failed. I made demand of N. S. Collins. He replied "that he had nothing to do with it, as the bank was in the hands of Capt. A. B. Hagen, as receiver. This was in Columbia county, Florida. I have never been paid my money. A. B. Hagen, for the State, testified as follows: I was duly appointed re-

ceiver of the Lake City Bank several days after its fail-
ure. I did not find in the bank sufficient funds to pay the
indebtedness of the bank. I was in the bank on the 8th
day of July, 1891, the day it closed, between 12 and 2
o'clock; I was there to enquire about a collection of
Sharp & Perkins; while there some person came in to
draw some money, it was Miss Annie Porter; she was
offered silver. She objected to taking it in silver; said
"no." Mr. Collins said you had better let me send it
home to you; she still insisted on having her money,
and said she would stay till she got it. Mr. Collins
said he would go to Mr. Porter's store and get some
currency. I left Miss Porter in the bank, and did not
see whether Mr. Collins came back or not. When I
took charge of the bank as receiver there was $171.06
only in money in the bank. Mr. Collins was present
at different times. I can not now recall all that Mr.
Collins said and did. Can not say that he admitted
anything about the liabilities of the bank. Can not
say that he admitted anything about the deposits, or
admitted anything specially; he was about there. I
knew of parties making deposits in the bank the day
it failed. Collins did not tell me that the bank would
close that day. James E. Young, for the State, testi-
fied as follows: I knew the liabilities of the Lake City
Bank by the books. The bank closed its doors and re-
fused to do further business on the 8th of July, 1891.
I dont know any one who was paid since the doors
closed. I was never in charge of the bank. I was vice-
president of the bank and one of its directors. Mr.
Collins managed the bank and was its president.
Thomas J. McNeill was cashier. Deposits were re-
ceived in the bank up to the time it closed. I live in Lake
City. After the bank closed Mr. Collins called on me
that night and told me the bank would not open in the

morning. Mr. Collins never called on me at any time for an assessment as a stockholder. My place of business is about 300 yards from the bank, and I passed there daily. I went into the bank at times and asked questions. Never been refused access to the books by Mr. Collins nor any one else before the bank closed. There was a meeting of the board of directors of the bank in April, 1891. Do not know how often the board of directors met. Do not know how often the by-laws required them to meet. I had implicit confidence in Noyes S. Collins and left it all to him. Collins told me the bank could run through the Summer without any more money. I went with Jno. V. Brown, who was a stockholder, in April, 1891, who asked N. S. Collins if he needed any more money, and he said not. I held $10,000 stock, and paid in $2,000; Brown $10,000, paid in $3,000; Edge and Bigelow each held $2,500 stock, on which they paid nothing. Mr. Collins then said there was due from other banks to the Lake City Bank about $47,000, which I understood to be assets. He said the bank was in good condition, had been hard up, but was in better condition than ever, had more money. He never asked me for any payment of any assessment on stock, or to pay in any money as a stockholder, nor to call a meeting of directors. W. F. Watts, recalled for the State, testified further as follows: I deposited $43.50 in the bank, of the value of $43.50—$23.50 in silver, and $20 in paper —don't remember the denominations. John V. Brown, for the State, testified as follows: Noyes S. Collins was president of the Lake City Bank, and he managed its affairs. I was one of the directors. The directors were James E. Young, A. G. Bigelow, J. B. Edge, N. S. Collins and myself. Collins never told me that the bank was going to close. The bank had stockholders,.

they were James E. Young, N. S. Collins, J. B. Edge, A. G. Bigelow and myself. There never was an assessment asked for before the failure of the bank. There was no meeting called before the bank failed. I last visited the bank April 5th or 10th, 1891, and Collins told me that the bank could get through the Summer without any more money being needed; that it was the hard times which made money matters close, and that the people had very little money in the country. I never insisted on calling a meeting of the stockholders or directors, because Collins, who managed the bank, never notified the directors that there was a necessity for more funds, nor did he ever notify the directors to meet and assess the stockholders to furnish additional means for the bank. Mr. Collins told me in April that there was $46,000 deposit liabilities of the bank. I held $10,000 stock of the bank and paid in $3,000; Young $10,000, and had paid in $2,000; A. G. Bigelow held $2,500, and had paid in nothing; J. B. Edge $2,500, and had paid in nothing. Since the bank closed none of the stockholders have been assessed, or paid anything. Collins had put in the building, safe and furniture. Mr. Collins then said the bank was in good condition; had been hard up, but was in better condition than ever. I had asked him if he needed any money to run through the Summer. He never asked me for payment of an assessment of stock, nor to call a meeting of directors, nor to pay in any money as a stockholder. Thomas J. McNeill, for the State, testified that he was cashier of the Lake City Bank, elected by the board of directors. The cash of the bank balanced after the bank closed, and on the day the bank closed, with receipts, disbursements and deposits as shown by the scratch-book of that day, and the books of the bank in my keeping. The bank

closed on July 8th, 1891, and did not open again. The trial balance of the books showed on the day the bank failed $19,000 at that date. This comprised the whole of the State's evidence.

The only evidence for the defendant was his own statement under oath in which he asserts his innocence, and in connection with which he exhibited to the jury the various books of entry of the bank, that showed that the deposit alleged to have been embezzled was regularly entered in said books to the credit of the depositors, W. F. Watts & Co., which statement it is not necessary to set out at length.

The three sections of our statute applicable to the embezzlement or misappropriation of property by banks or their officers, or by bankers, in force at the time of the commission of the alleged offense (Sections 27, 28 and 29, page 362 McClellan's Digest), provide as follows: Section 27: "Any person whose legitimate business requires him or her to receive the money or property of another, or any banker or broker who shall receive on deposit money belonging to another, or any municipal, county or state officer whose duty requires him to receive public money or property, or the property or money of another, who shall use, conceal, or wilfully withhold any of said money or property so as to prove a defaulter therein, shall be guilty of larceny, and upon conviction thereof shall be punished according to the laws punishing larceny." Section 28. "If any officer, agent, clerk or servant of any incorporated company, or if a clerk, agent or servant of any private person or copartnership (except apprentices and other persons under the age of sixteen years), embezzles or fraudulently converts to his own use, or takes, or secretes, with intent so to do, without consent of his employer or master, any property of

another which has come to his possession, or is under his care .by nature of such employment, · he shall be deemed guitly of larceny, and punished accordingly.'' Section 29. "If any officer of any incorporated bank, or any person in the employment of such bank, fraudulently converts to his own use, or fraudulently takes. and secretes, with intent so to do, any bullion, money,. note, bill, or other security for money, belonging to. and in possession of such bank, or belonging to any person and deposited therein, he shall, whether intrusted with the custody thereof or not, be deemed guilty of larceny in said bank, and be punished by imprisonment in the State penitentiary not exceeding ten years, or by fine not exceeding one thousand. dollars.''

Under the laws governing banking, deposits by the clients or customers of a bank therewith are divided into two classes, *viz:* special or specific deposits, and general deposits. When the identical money or other thing deposited is to be restored, or is given to the bank for some specified and particular purpose, as to pay a certain note or other indebtedness, or to act as agent for the collection of bills or notes deposited for collection, such collections to be remitted, such deposits are special or specific, and the property in the deposit remains in the depositor; the bank, in such. case, becoming bailee, trustee or agent for the depositor. The simple deposit of money in a commercial bank on account of the depositor, without being complicated by any other transaction than that of the depositing and withdrawing of the moneys by the customer from time to time, is a *general* deposit, and it is now well-settled both in England and America that such a deposit transfers the ownership of the money to the bank; and that the relationship with reference,

thereto as between the bank and the depositor is simply that of debtor and creditor at common law. The original and every subsequent general deposit by the customer is in strict legal effect a loan by the customer to the bank. Morse on Banks and Banking, Sections 567, 568, and numerous authorities there cited; Foley vs. Hill, 2 H. L. Cas., 27; State vs. Clark, 4 Ind., 315; Marsh vs. Oneida Cent. Bank, 34 Barb., 298; Downes vs. Phoenix Bank of Charlestown, 6 Hill, 297. In Bank of Northern Liberties vs. Jones, 42 Pa. St., 536, the court says: "Money, when paid into a bank, ceases altogether to be the money of the principal; it is then the money of the banker, who is bound to return an equivalent by paying a similar sum to that deposited with him, when he is asked for it. The money placed in the custody of a banker is to all intents and purposes the money of the banker, to do with it as he pleases; he is guilty of no breach of trust in employing it; he is not bound to keep it or deal with it as the property of his principal, but he is of course answerable for the amount, because he has contracted, having received that money, to repay to the principal, when demanded, a sum equivalent to that paid into his hands. The trade of a banker is to receive money and use it as if it were his own, he becoming debtor to the person who has lent or deposited with him the money to use as his own, and for which money he is accountable as a debtor. I can not at all confound the situation of a banker with that of a trustee, and conclude that the banker is a debtor with a fiduciary character. A banker is, therefore, in relation to his customer, neither a trustee nor a *quasi* trustee, but simply a debtor to him for a loan. The relation thus established is that of debtor and creditor merely, unaccompanied by any fiduciary connection."

Commercial Bank of Albany vs. Hughes, 17 Wend., 94; Ætna National Bank vs. Fourth National Bank, 46 N. Y., 82; Marine Bank vs. Fulton Bank, 2 Wall., 252; Bank of the Republic vs. Millard, 10 Wall., 152; People vs. Wadsworth, 63 Mich., 500.

Another well-settled principle of law is that where several individual men are authorized and empowered by law to act in a *corporate* capacity, their natural and individual capacity as to all matters respecting the subject of their incorporation becomes totally extinct. If A, B and C are granted a charter as an incorporated company, having a designated corporate name, to carry on the business of banking or any other enterprise, then in respect to all of the business of such corporation the natural and individual capacity of A, B and C becomes wholly extinct. Rex vs. Patrick and Pepper, 1 Leach's Crown Cases, 287. In recognition of these established principles of law, the sections of our statute above quoted were enacted; not for the purpose of overturning or contravening them, but for the purpose of providing punishment for those crimes that might otherwise find a safe refuge behind the rules announced. When Section twenty-seven of our statute, above quoted, inhibits *the use*, concealment, or wilful withholding, by any banker, of the money or property of another that may have been received by such banker on deposit, it was not intended to break up the established banking customs of the country or to annul the rules of law fixing the status between the banker and his customer, or to prohibit the use in his business by the banker, in a legitimate way, of moneys deposited generally with him, and for which, as before shown, he becomes the debtor of the depositor, the money so deposited generally to the credit of the depositor being commingled with and becoming

a part of the general funds of the banker. The purpose of this section of the statute was not to interfere with this well-settled right on the part of the banker in dealing with his general deposits, but is intended to prohibit and prescribe punishment for the use, concealment or wilful withholding by the *individual* or private banker of any money or property that may have been deposited with him as a *special* or *specific deposit* under such circumstances as will continue the *ownership* of the deposit *in the depositor*, and that constitutes the banker the bailee, agent or trustee thereof for the depositor. When, therefore, the individual or private banker uses the moneys deposited *generally* with him by his customers, and for which he becomes the *debtor* of such patrons, in his legitimate business, his subsequent failure or inability to repay the amounts of such indebtedness, brought about by legitimate but injudicious speculations, loans or investments, without other fault upon his part than want of good judgment, energy or enterprise, then he can not be reached criminally under this statute. In consonance also with these principles, and in recognition of the other principle announced, that the individuals composing an incorporated company lose their individual and natural capacity in all matters that they deal with in their corporate capacity, Sections 28 and 29 of the statute quoted were enacted to punish any officer, agent, clerk or servant of any incorporated company or of any private person or copartnership, or any officer of any incorporated bank or any person in the employment of such bank, for any fraudulent conversion to his own individual use of any property belonging to such bank or to his employer, or belonging to any other person and deposited specially in such bank or with his employer. Section 27,

above quoted, that, from the charges of the court to the jury, seems to be the one under which the indictment was attempted to be framed, is aimed at the *individual* or *private* banker, and is intended, as before stated, to prohibit and punish the use, conversion or wilful withholding by the *individual* or *private* banker of any special or specific deposit that continues to be and remain while in his custody the *property of another*, or of the depositor. Under this section of the law the *officer, agent, clerk* or *servant* of any incorporated company, or the clerk, agent or servant of any private person or copartnership, or the *officer of any incorporated bank* can not be reached for the wrongful conversion of the property either of his corporation or employer, or for the conversion of property that his corporation or employer holds in special deposit as bailee or trustee; Sections 27 and 29 being applicable to them, and Section 29 applicable particularly to the wrongful conversion by the *officer* of any *incorporated* bank, prescribing a different and much severer penalty. The indictment in this case attempts to blend the provisions of Sections 27 and 29 together, undertaking to ground the offense charged under both sections at the same time. In it the defendant is alleged against as an *individual* banker, and at the same time he is charged as being the *officer* of a bank, to-wit: as *president* of the "Lake City Bank." When we come to the proofs there is not a word of evidence that tends to show that he was an *individual* or private banker, or that he conducted any banking business whatever in his *individual* capacity, but all the proof shows that the banking business, in the conduct of which he received the alleged deposit, was carried on either by an incorporated company or by a joint stock copartnership of which and for which he acted

in the official capacity of *president*. There is no express proof that the "Lake City Bank," of which the defendant was president, was a legally incorporated body, but the proof does show that it had shareholders and a board of directors, a president and vice-president, concomitants that usually belong to regularly incorporated companies. If it was an incorporated company, then the indictment should have so alleged, and should have been framed under Section 29 of the statute quoted, and the defendant therein should have been alleged against as the officer, to-wit: the president of the incorporated bank known as and doing the business of banking under the corporate name of "The Lake City Bank." If the Lake City Bank was not incorporated, but was a joint stock copartnership with the defendant as its managing president, and he conducted the banking business not in his own individual capacity or on his own individual account, but as a member of, or as the clerk, agent or servant of the copartnership or joint stock company, then he should have been charged under Section 28 of the statute, and his status towards such company or copartnership should have been alleged. He could not at the same time transact the same piece of banking business in his *individual* capacity and on his own individual account as a private banker and also as the *officer* or member of an *incorporated* company of bankers, or as the clerk, agent or servant or member of a copartnership. Again the proof here shows clearly that the money alleged to have been used or withheld by the defendant was a *general* deposit by the depositors to their credit on general account with the "Lake City Bank," and not with the defendant as an individual banker, which *general* deposit, as before shown, constituted the "Lake City Bank" the owner of the money

and made it, whether an incorporation or copartnership, the *debtor* of the depositors, yet the indictment alleges that the money alleged to have been misappropriated by the defendant was the property of the depositors, a variance between the allegation and proof that is fatal. Under the proofs as to the making of the deposit, the indictment should have alleged the money to be the property of the "Lake City Bank," and if there was a misappropriation thereof by the defendant as an *officer* of such bank, it being incorporated, he should have been alleged against as such under Section 29, or if he was the clerk, agent or servant of an unincorporated copartnership he should have been alleged against as such under Section 28, and the money, under the proofs, should have been alleged to be the property of such copartnership.

The State's witness, Thomas J. McNeill, who was cashier of the Lake City Bank at the time of its failure and cessation of business, testified that the trial balance books of the bank showed on the day the bank failed $19,000 at that date; and A. B. Hagan, who was appointed receiver of the bank's assets within a few days after its failure, testified that when he took charge as receiver there was only $171.06 in money in the bank. We do not understand from McNeill's testimony, however, whether the $19,000 as shown from the trial balance books of the bank represented cash on hand at the date of failure, or whether it was made up of cash and debits due by others to the bank. If, however, it is to be understood as representing cash on hand at the time the bank closed and ceased to do business, then there is no proof to fasten the responsibility for its disappearance upon the defendant between the time of the closing of the bank and the assumption of control thereof by the receiver. If

there was $19,000 in cash on hand when the bank closed, there is no proof to show whether the defendant or some other person made way therewith between that time and the appointment of the receiver when there was only $171.06 left. The proofs are absolutely deficient in this respect. From what has been said it is evident that the facts in proof do not sustain the allegations of the indictment, and that the indictment itself contains such an incongruity of allegation as to the statement of the offense sought to be charged that it becomes impossible legally to convict under it with the facts in proof.

The judgment of the court below is reversed and a new trial ordered.