OREL J. MYERS, as Receiver of Palm Beach Bank & Trust Company, and PALM BEACH BANK & TRUST COMPANY, a Corporation, Appellants, v. ERNESTINE MATUSEK, Appellee.

Division A.

Opinion filed December 28, 1929.

*Blackwell, Donnell & Moore,* for Appellants;

*Ritter & Rankin,* for Appellee.

BROWN, J.—This appeal was taken from an order of the circuit court of Palm Beach County adjudging that the claim of the appellee constituted a preferred claim in the sum of $19,124.72, against the receiver of the Palm Beach Bank & Trust Company, and that the remainder of said claim should be allowed as that of a common creditor. The full amount of appellee's claim was $25,000.00, and it was contended by appellee that it should be allowed as a preferred claim in full. From this order and decree the defendant receiver took this appeal, assigning the rendition of same as error. Appellee filed a cross assignment of error upon the ground that the order should have allowed

her entire claim as a preferred claim. Appellee acquired the claim involved in this suit by a valid assignment from Dr. Frederick Bleil based upon a valuable consideration.

On May 28, 1926, Dr. Bleil wrote Mr. Carter, the trust officer of the Palm Beach Bank & Trust Company, that he had $25,000.00 that he would not need until the following October, and asked ''if Mr. Clayton's Mortgage Company had any guaranteed notes that would come due around that date'' and which he, Bleil, could buy. On June 4, 1926, the trust officer replied, saying that Mr. Clayton stated that he did not have any notes in his mortgage company that would mature in the neighborhood of that date and for that reason, he, Clayton, could not use the money; but added: ''We have some securities in the trust department that will yield 7% to you. You could send the money down in the nature of a trust deposit, subject to call and to be withdrawn October 1st, we would turn over to this account securities to that amount, and pay you 7% interest on the money at the time you requested the return of said money to you, this interest to be paid from the date of the receipt of the money by us until you called it in.''

On June 9th, Dr. Bleil wrote the trust officer as follows: ''I am enclosing check for $25,000.00 to be used as a trust deposit, subject to call, on which your trust department will pay me 7% from the time you receive this money until I withdraw it. I believe this is in accordance with the proposition you made to me. Kindly let me know if this is correct and oblige,'' etc.

Upon receipt of this money by the bank the following entry was made on the books of the bank by the trust officer: ''Trust N. 86, Frederick Bleil, deposit of $25,-000.00 left with us as trust deposit for investment pur-

poses, balance $25,000.00.'' This was the only entry made on the books of the bank with reference to this transaction.

We think the chancellor was correct in concluding that this letter, just quoted, enclosing the check, and the entry on the bank's books, showed an acceptance of the proposition made in the trust officer's letter of June 4th, and that the interest-bearing deposit so made constituted a special deposit to be secured by the setting aside of sufficient securities, in the nature of collateral, to secure the deposit. It is admitted that this check for $25,000.00 was paid in due course and that the Palm Beach bank received the benefit not of the actual proceeds, but of a liquid credit equal thereto, said check having been deposited by it with the Atlantic National Bank on June 12th and was placed to the credit of the Palm Beach bank on that day, and appears to have been treated by both banks as the potential equivalent of cash, which it turned out to be. But instead of setting aside any securities whatsoever to secure this special deposit, the Palm Beach bank mingled the funds thus received with its general funds, the cash assets, of the bank, in its commercial department. On June 28, 1926, fourteen days after acknowledging receipt of the check, the bank closed its doors and it was taken over by the comptroller who appointed Orel J. Myers as receiver, which appointment was confirmed by the court and all the assets, books and affairs of the bank were turned over to such receiver. The bank did not list this $25,000.00 among its liabilities, and the trust officer testified that this money was not loaned to the bank or treated as a loan by the bank. No note or pass book, or other evidence of debt was ever issued by the bank to Dr. Bleil.

On October 9, 1926, Dr. Bleil filed with the receiver his claim for the sum of $25,000.00, asking that said sum of money be returned to him or that the same be made a pre-

ferred claim against the assets of said bank. This claim was rejected by the receiver as a preferred claim but was allowed by him to remain on file in his office as a general claim against the bank. On December 15, 1926, Dr. Bleil assigned to appellee, Ernestine Matusek, for a valuable consideration, all of his right, title and interest in and to said sum so deposited by him in the trust department of the bank.

The defendants in their answer alleged that this money was sent as a direct loan to the bank and was not entitled to be considered as a preferred claim, and that complainant had waived any right she may have had against the bank and its receiver for preferential payment. The evidence, properly construed, does not, in our opinion, sustain the allegations of waiver on the part of Dr. Bleil or appellee. The ruling of the chancellor on this question is affirmed. Nor does the evidence show that the bank held these funds as borrowed funds.

Our conclusion is that the deposit in question was a special deposit for a particular purpose, to be secured by collateral in the form of securities to be set aside for that purpose; but even if this transaction could be regarded as a mere loan to the bank, which we think would be an erroneous construction, it would still remain true that, in view of the fact that the bank wrongfully failed to set aside the securities and put them behind this special deposit, as it agreed to do, the supposed loan was never completed, and the bank, holding the funds as a constructive trustee, never acquired title to the funds, which remained the funds of Dr. Bleil, and which it had no right to commingle with its own funds. Such commingling amounted to a misappropriation of trust funds. Therefore the chancellor was correct in holding that the claim should be treated as a preferred claim. Collins v. State, 33 Fla. 429, 15 So. R. 214; City of

Miami v. Shutts, 59 Fla. 462, 51 So. R. 929; Amos v.Beard, 117 So. R. 789, 96 Fla. 181; 7 C. J. 75; Note in 31 A. L. R. 483-4; 57 A. L. R. 382-386; 60 A. L. R. 330-336; Hutchinson v. Bank, 145 Ala. 196, 41 So. R. 143; Harrison v. Smith, 83 Mo. 210, 53 Am. R. 571; Perry on Trusts, 7th Sec. 835, et seq.

We also think that the chancellor was correct in holding that Miss Matusek had not waived or released her right to continue to insist upon her claim as a preferred claim, it having been originally filed as such, and neither had Dr. Bleil waived this right, if he did so at all, before he assigned the claim to her. The action of the receiver, who is not vested with judicial powers, in rejecting the claim as a preferred claim and filing it as a general claim, and in issuing to Dr. Bleil, subsequently to his assignment of his claim to Miss Matusek, a receiver's certificate therefor as a general claim, could not deprive Dr. Bleil's asisgnee, in the absence of clear proof of waiver or release by her of the claim as a preferred claim of the right to have such question, thus determined *ex parte* by the receiver, adjudicated by the courts.

But the difficult question in this case is whether or not the court should have allowed this claim as a preferred claim against the general cash assets of the bank, coming into the hands of the receiver, to the full amount of $25,000.00 and interest, or for the minimum balance to the credit of the Palm Beach bank with its correspondent bank through which the check was cleared, between the time of its deposit with such correspondent bank and the time the Palm Beach bank closed its doors.

When this check was received by the bank, it was sent to one of its several correspondent banks with which it kept a deposit, namely, the Atlantic National Bank of Jacksonville, where it was deposited on June 12th to the credit of

the Palm Beach Bank and Trust Company. The Palm Beach bank received credit for the check on that date—in effect, it "cashed" the check. It was paid on June 16th through the New York clearing house by the New York bank on which it was drawn. The Palm Beach bank had on deposit with the Atlantic National in excess of $40,000 from June 12th to June 14th. This deposit was reduced to $19,124.72 on June 16th. However, on the following day, June 17th, additional deposits were made, increasing the total deposits to the credit of the Palm Beach bank on that day to $97,649.03. On June 18th this amount had risen still further to $142,263.51. With the exception of two days from that time on until the Palm Beach bank closed its doors it had on deposit daily with the Atlantic National Bank sums in excess of $80,000; on June 22nd its deposits with said Jacksonville bank were upwards of $143,000.00, and on June 28th, the day the Palm Beach bank closed, it had on deposit with the Atlantic National something over $140,000, which came into the hands of the receiver of the Palm Beach bank.

The chancellor based his findings as to the amount of the claim as a preferred claim upon the fact that in the interim between the time Dr. Bleil's check was deposited by the Palm Beach bank with the Atlantic National bank and the closing of the Palm Beach bank there was, as above shown, at one time, on June 16th, only $19,124.72 on deposit to its credit in the Jacksonville bank according to the records of that bank, and that the claim could not be allowed as a preferred claim in excess of that amount. It might be observed in passing that the evidence does not show that the actual cash realized from the ultimate collection of this check ever went into the vaults of either the Atlantic National or the Palm Beach bank. The trust officer of the Palm Beach bank testified that the check was paid in New

York and the amount of it had already been credited by the Palm Beach bank to its trust department.

The evidence showed that the bank had only one common fund, which was made up of cash and cash items in its bank at Palm Beach, together with cash on hand to that bank's credit in correspondent banks such as the Atlantic National Bank at Jacksonville, the Hanover National Bank and the Guaranty Trust Company in New York City and other banks, and there was no differences made in any of these accounts to indicate whether the cash in the vaults or the balances in the correspondent banks came from the savings department, or the trust department, or the commercial department of the bank, all being first commingled together and handled in and by the commercial department; that there was no way to tell what part of the loans and discounts and what part of the cash and what part of the money on deposit at the correspondent banks which showed up in the general statement of the bank was a part of the balance to the credit of the trust department on the books of the bank; that all monies which came into the bank from its various departments were credited on the books to the respective department from which they came, but were all commingled in the one general and common cash fund of the bank, represented as heretofore stated by the cash in the vault, cash items, and cash balances in correspondent banks. To ascertain, therefore, at any given time the amount of real cash assets of the bank, the funds in its own vault and the monies of the bank deposited to its credit in its correspondent banks would have to be summed up and included. It appears that in the conduct of its business, the Palm Beach bank would constantly draw upon its deposits in its several correspondent banks, making other deposits with them to replace, or cover, or sometimes to exceed, the drafts thus made, and thus in prac-

tical effect treating its deposits in correspondent banks as a part of its operating cash assets, of which the funds in its own vaults formed merely a part.

The evidence further shows that when the receiver took charge of the bank there was turned over to him by the State banking department cash and cash items of the bank aggregating $62,212.42, of which $29,690.11 was actual cash and the remainder cash items, upon which the sum of more than $26,000.00 was collected by the receiver; that he also received from the Atlantic National Bank $140,-337.72, being the balance of cash on hand in that bank to the credit of the Palm Beach bank when it closed its doors.

The cash balances in the vault of the Palm Beach bank fluctuated from $277,000.00 on June 12th down to $156,-000.00 on June 27th, and shrunk to $23,355.43 during June 28th, the day that the bank closed its doors. In addition, however, to the $140,337.72 on hand with the Atlantic National Bank, and the amount of cash in its vaults, when it closed its doors, the bank also had considerable cash balances to its credit with other correspondent banks. It therefore, appears that at no time from the date Dr. Bleil's money was received by the bank up to the time its doors were closed was the *general* cash assets of the bank less than the amount of appellee's claim.

In an interesting note dealing with the question here presented in the December, 1928, number of the Minnesota Law Review, supported by numerous citations of cases which space will not permit us to reproduce, it was, in part, said:

"In each case where a customer of a bank asks to have his claim paid in full on the ground that the bank at the time of the insolvency held a certain fund as trustee, two questions arise: first, whether the cus-

tomer, at the time of the deposit, retained a property interest in the deposit, and, second, whether that deposit can be traced into the assets in the hands of the receiver. It is the latter question with which this note deals.

"Formerly the equitable right of following misapplied money or other property into the hands of the parties receiving it depended upon the ability of identifying it; the equity attaching only to the very property misapplied. This right was first extended to the proceeds of the property, namely, to that which was procured in place of it by exchange, purchase or sale. But if it became confused with other property of the same kind, so as not to be distinguishable, * * * the equity was lost. Finally, however, it has been held as the better doctrine that confusion does not destroy the equity entirely, but converts it into a charge upon the entire mass, giving to the party injured by the unlawful diversion a priority of right over the general creditors of the possessor. (Peters v. Bain, 133 U. S. 670, 33 Law Ed. 696.) This final result is called the 'modern doctrine' and is almost universally accepted by the courts and applied in tracing trust funds in bank insolvency cases.

"But even though the courts agree on the 'modern doctrine,' they are in hopeless confusion in their application of it to the different sets of facts which arise in bank insolvency cases. From a study of the decisions in these different situations, which will later be taken up one at a time, it seems that the cases might be divided into two groups. One group holds that the trust money must be traced into a specific fund in the receiver's hands, such as the cash on hand at insolvency, a deposit in a correspondent bank, or

definite bonds or notes. This is clearly the rule in the Federal courts. The other group holds that it is only necessary to trace the trust money into the general assets in the receiver's hands, and that it is not necessary to trace it into any specific fund. There are a few cases which go to extremes in both directions, such as demanding that the exact money be traced into the receiver's hands, or saying that it is not necessary to trace it into the receiver's hands at all, but that it is sufficient to trace the money into the hands of the bank. These cases, of course, are clearly contrary to the weight of authority.

''Of the two main groups, the former seems to fit in the best with the universally recognized theory that when a depositor is allowed a preference, it is done, not on the idea that there is a debt due and owing to him, but that when the funds are commingled the depositor has a right to a proportionate share of the mass, or an equitable lien upon it, and that, therefore, the receiver has property which belongs to the depositor, and the depositor is simply claiming his property. But those cases in the second group, holding that it is sufficient to trace the money into the general assets in the receiver's hands, can also be reconciled with this property right theory by saying that all of the assets of the bank are one big fund, and that once the money is commingled, this whole fund is subject to the charge, and therefore the depositor has a property right in this sum total of the assets.

''Where the deposit is in the form of cash, and was made shortly before the bank went into the hands of the receiver, and the cash on hand was, at all times after the deposit was made, equal to or more than the

amount of the deposit, all the courts agree that the depositor should have a preference over the general creditors; but where the cash on hand at the time of insolvency is not sufficient to pay the preference, those courts which demand that the trust money be traced into a specific fund refuse to allow a preference as to anything but the cash on hand, which seems entirely correct on the theory adopted by these courts that the depositor's lien extends only to the specific fund into which the money has been traced. But those courts which only require a tracing into the general assets allow a preference on all the assets, which they can do and still be consistent with their theory that the whole sum total of the assets is impressed with the lien of the depositor. And of course those courts requiring only a tracing into the bank's assets, not into the receiver's at all, allow a preference on all the assets.

"Minnesota, by two recently decided cases, has taken a place among those jurisdictions which are very liberal in allowing preferences. Both of these cases hold that as soon as the depositor shows that the money has once entered the hands of the bank he has established a *prima facie* case. One of the cases, Eastman v. Farmer's State Bank of Olivia, (Minn. 1928) 221 N. W. R. 236, allows a preference on the general assets, the cash on hand being insufficient; and from the facts of the case, it seems it is only necessary that the fund be traced into the general assets in the receiver's hands, not into any specific asset. Another thing the facts of this case indicate is that the receiver does not show dissipation of the trust fund by showing that the trust money was used in the general banking business, including the payment of current obliga-

tions. The other case goes even farther and refuses to admit evidence showing that the deposit was dissipated in the payment of obligations.

"The decisions of the courts on the different phases of tracing trust funds in bank insolvency cases indicate that the courts do not always hold strictly to the law of trusts in deciding whether or not a preference should be allowed."

The Minnesota case last above referred to is Blythe v. Kujawa, 220 N. W. R. 168, 60 A. L. R. 330. In the opinion in that case it was said:

"The receiver offered to prove that the check in question was sent by defendant bank to its Chicago correspondent for collection and credit, and was there credited to defendant bank, and that thereafter all of its deposit in the Chicago bank was dissipated in payment of debts of the defendant bank except a balance of $353.48, and that therefore no part of the proceeds of the check in excess of that sum ever came into the hands of the receiver. Objections to these offers and to questions asked for the purpose of so proving were sustained by the trial court. These rulings were assigned as errors. * * *

"The complainant alleges clearly that the sum of $4,500 was left with the bank in escrow as a special deposit for the specific payment of that sum to the Kujawas; that it was a trust fund. The exclusion of these offers and evidence may well be rested on the objection that they were not admissible under the pleadings. That aside, the offers concede that the local bank received full credit for the check, and it thereby immediately became a part of its assets. Whether the bank thereafter paid out obligations direct over its

counter at home or through its Chicago correspondent would not seem important. Whether a man uses his left or right hand in paying an obligation does not matter. We are unable to make any distinction between the cash funds kept by this bank in its own vault and in the vault of its Chicago correspondent. The money in either place was a part of the cash holdings of the bank as a whole. And, having at all times since the receipt of this fund had on hand and turned over to the receiver cash more than sufficient to pay this trust fund, neither the receiver nor the general creditors have cause for complaint.''

In the recently published Seventh Edition of Perry on Trusts, Section 836, it is said:

''It is well settled that the mere misappropriation of trust funds of another does not give the beneficial owner any rights against the *general estate* of the misappropriating trustee in preference to the latter's general creditors. In the absence of ability to trace the misapplied funds into property of the insolvent trustee, the beneficial owner is only a creditor to the extent of his claim, and so may sue at law. But there is much conflict of authority on the question of what is sufficient identification of the misapplied trust funds which have gone into assets of an insolvent trustee. One line of decisions is to the effect that there will be no trust or lien in favor of the beneficial owner of the misapplied funds unless the trust property or its proceeds can be traced into some specific fund or property; the fund or account of which the trust funds form a part, or the identical property into which they have gone must be pointed out. Other cases have impressed a preferential lien upon the assets of the

trustee, in favor of the beneficial owner if it is shown that the trust funds or their proceeds are somewhere in the assets, although they cannot be traced into specific articles or parcels of property or into any definite fund. Some decisions have gone to the extent of holding that a preferential lien will be impressed upon the assets of the trustee if it appears that his assets have been increased by the misappropriated funds, although it is not possible to show that the fund itself went into the assets, and, in the absence of evidence to the contrary, will presume that such an increase has resulted. The result of these decisions is that merely showing that the trustee has received trust funds will impress a lien upon his assets unless it is shown that his assets were not increased by the misappropriation. But the great weight of authority is against this view. If it is affirmatively shown that the misappropriated trust funds have been dissipated without directly or indirectly augmenting the estate which has come into the hands of the trustee's assignee, probably no court would impress a trust or a lien upon the assets in favor of the beneficial owner of the misappropriated property. This would usually be the case where it is shown that the trust funds were used to pay debts of the trustee.''

The identical question involved in this case has not been heretofore squarely presented to this court for decision, but in Glidden v. Gutelius, 96 Fla. 834, 119 So. R. 140, this court, speaking through Mr. Justice BUFORD, said that: ''where trust funds are commingled with other funds of the trustee and disbursements are made from the common fund, or the common fund is wasted, it will be presumed that that part disbursed or wasted was that of the trustee, and not the property of the *cestui que* trust.''

Further on in the same opinion, it is said:

"It has been contended in the case now before us that only the cash on hand at the time the bank closed, which was the lowest amount of cash on hand in the bank at any time after the creation of the trust, is the limit of the cash which may be applied to the discharge of trust obligations. Whether or not this is correct depends upon whether or not deposits of cash in other banks were made up of commingled funds as above referred to, or constituted funds which had never been commingled with the trust fund. Such deposits may have come from sources which had not been in any wise commingled with the trust fund, and these facts can be ascertained by the introduction of proper evidence."

See also the opinion of Mr. Justice WHITFIELD on rehearing in the same case, 120 So. R. 1, 96 Fla. 850, wherein it was held that when a bank, with statutory trust company powers to invest funds held by it as an administrator in a particular class or type of securities, commingles such funds with its general funds and then invests such commingled funds in securities of the type authorized by statute, upon failure of the trustee bank *cestuis que trustent* may have a preference in that class of authorized securities remaining in the trustee's assets, in the absence of any showing that the trust fund was *not* invested in such securities.

This holding is grounded, in part at least, upon the presumption, in the absence of contrary proof, that the trustee did its duty, and that, instead of dissipating the trust funds, it invested them in the class of securities authorized by statute.

In view of the importance of the questions here raised, we have set forth the above summary of the varying judicial opinion thereon, adding thereto the substance of our own former decision in the Glidden v. Gutelius case, which indicates the tendency of this Court in the direction of what

has been referred to as the majority doctrine. Further treatments of the subject will be found in Lewin on Trusts, Vol. 2, p. 894 *et seq.;* 39 Cyc. 536; 28 A. & E. Encyc. Law, 2nd Ed., 1115-1120; 26 R. C. L. 1353-8; 7 C. J. 751 *et seq.* The majority view is well presented in Crawford County Commr's v. Strawn, 157 Fed. R. 49, 84 C. C. A. 553, 15 L. R. A. (N. S.), 1100, and Schuyler v. Littlefield, 232 U. S. 707, 58 Law Ed. 806.

The authorities are quite generally agreed upon the fundamental principle that the right of a *cestui que* trust to reclaim trust funds in specie or impress the trust upon other property in the hands of the trustee, or of a purchaser with notice, is founded on the right of property and not on the ground of compensation for its loss, and hence the beneficiary of a trust fund is not entitled, solely because of the character of his claim, to the payment of the same in full out of the assets of the insolvent trustee's estate, to the exclusion of general creditors. On the other hand, general creditors have no right to have their claims paid out of property or its proceeds which never actually belonged to the insolvent trustee, if they can be sufficiently identified or traced as to justify their separation from the corpus of the trustee's estate, and their return, in specie or in value, to the owner.

It is, as we have seen, also well settled that when a trustee wrongfully commingles trust funds with his own funds, equity will impress the trust upon the entire mass with which the trust fund has been thus commingled, for the enforcement of the reclamation of the trust fund.

The question here, where the trustee was a bank, is, what constituted the "entire mass" with which the trust fund was commingled? Should it be defined as the entire cash assets of the bank at the time of such commingling, including those deposited by it with its correspondent

banks, as well as the cash in its own vaults, or should it be confined to the deposits in the particular correspondent bank with which the trustee bank saw fit to deposit the check of the *cestui que* trust?

It must be admitted that if the latter or specific fund be regarded as the commingled fund, the enforcement of the collection of trust funds against banks would frequently depend upon the constantly shifting balances in correspondent banks, due to various purely adventitious circumstances growing out of the conduct of current business, or the convenience of the bank in the handling of its affairs. The result in many cases might be that the trust funds of some of the *cestuis que trustent* of a bank would, without deliberate design from any quarter, be entirely wiped out, while those of others deposited in some other correspondent bank, might be protected in full, merely because it suited the convenience or caprice of the bank to draw heavily against its deposits in a particular correspondent bank subsequently to the deposit of trust funds therein. It is contended that if the bank kept the cash in its own vaults in three separate tills, using all three daily or constantly in the conduct of its business, shifting the funds from one to the other as its convenience dictated, the mere fact that a trust depositor's money was shown to have been placed in a particular till which, subsequently, on the closing of the bank, was found to be depleted or empty, though the other two were full, would hardly be held sufficient to defeat the claim of the *cestui que trust*.

It is earnestly insisted therefore that there should not be any distinction in the cases of this kind between the bank's cash in other bank vaults and that in its own vault, and that where, as in the case at bar, a bank takes a trust fund from its trust department and mingles it with its general cash assets in its commercial department, and then

deposits the particular fund in a correspondent bank, and between that time and the closing of the doors of the bank, there is at all times more funds in the bank's vault combined with those on deposit with its correspondent bank than is required to protect the trust fund in full, the trust should be impressed upon the combined or entire fund; that a trustee should not be allowed to defeat the reclamation of a trust fund by merely splitting the entire fund with which it is commingled into several different divisions and depositing them for its own convenience in several different places respectively and afterward depleting the particular division in which the trust fund had been placed, while holding intact or building up the funds in the other two.

We freely concede the plausibility of this line of argument. In fact, it is so persuasive that it has divided the courts of this country into two camps. But we believe the majority doctrine is based upon sound principles and should be adhered to. Where no specific lien is created by contract, or the acts of the parties, none exists. The only course open to equity is to discover the corpus of the trust fund, or to follow the charges of transmutations of the trust moneys into some particular property or fund that can be charged with the trust, saving of course the rights of innocent purchasers for value. In furtherance of this principle the equity courts have gone as far as they can to make it effective, by holding that where the trust fund is traced into a commingled fund, a part of which has been dissipated or wasted, the courts will presume (following Knatchball v. Hallett, L. R. 13 Ch. Div. 696) that the trustee used or wasted his own funds instead of the trust fund.

In this case the evidence shows that this particular trust fund was deposited in a certain bank on June 12th, along

with other funds of the trustee, and that four days later this deposit was reduced below the amount of the trust fund, thus showing that it had been to that extent dissipated, or, at least, had disappeared. The evidence does not show where the funds thus drawn out went. They may have been drawn upon to replenish the bank's own vaults, and thus the portion of the trust fund so withdrawn may have gone back into the bank's vaults ·from which the entire trust furid came five days previously. Or it may have gone to augment the bank's deposits with some other correspondent. Or it may have been dissipated in the payment of the bank's obligations. But it might be said in reply to this last possibility, why should it be presumed that this portion of the fund was dissipated or wasted, when the law generally presumes that a trustee does his duty and conserves the trust fund? Why not presume that this portion of the fund was drawn back into the bank's vaults?

We have noted above that the law does presume that the trustee first drew upon his own part of the commingled fund, but when he goes farther and actually withdraws a portion of the trust fund, the *cestui que trust,* for the reasons already pointed out, supporting the majority doctrine, will lose *pro tanto,* in the absence of evidence of restoration of the funds wrongfully withdrawn, or in the absence of evidence tracing the trust funds so withdrawn, into some other specific property or fund coming into the hands of the trustee.

It is true that the trust fund of appellee's assignor, Dr. Bleil, or the check which represented them (the check by its subsequent payment having been shown to be worth its face value in money), was commingled with the funds of the bank in its commercial department, but the evidence goes further and shows that this check was extricated from

the bank's vault and deposited with others of its funds in a certain correspondent bank, with which funds it was commingled in that bank. Thus the evidence traces this trust fund into a particular fund, which was subsequently reduced to a sum less than the trust fund. Appellee was apparently not able to trace the fund, or the withdrawn or transferred portion, any further. If that were all, according to the weight, and we think, the better reasoning, of the decided cases (see Board of Commr's v. Strawn, *supra*, and note in 15 L. R. A. N. S. 1100), appellee would have been limited to the lowest balance of the commingled fund in the correspondent bank, to the credit of the trustee bank, between the time the trust fund was thus commingled and the closing of the trustee bank, as found by the court below, unless it can be held that the trust fund thus withdrawn was restored in such sort as to authorize its reclamation as a preferred claim in toto. The question arises, can such restoration be presumed under the facts in this case?

As we have observed, the lowest balance to the credit of the Palm Beach bank with the Atlantic National after the deposit of this check for $25,000.00 with the latter bank was $19,124.72, on June 16th, as shown by the books of the Atlantic National, which was increased the very next day, by additional deposits coming in from the Palm Beach bank, to $97,649.03. The nature and purpose of these additional deposits are not shown. It is obvious that they were more than sufficient in amount to restore the deficit in the depleted trust fund.

"If the mingled fund is reduced at any time below the amount of the trust fund, the latter will be regarded as dissipated except as to the balance remaining in the fund, and sums subsequently added from other sources cannot be treated as a part of the trust fund unless the withdrawals were wrongful and the restoration can under the circum-

stances be presumed to be of the amounts wrongfully withdrawn.'' 39 Cyc. 540.

As between the trustee and the *cestui que trust,* where no rights of third parties are involved, the making of additional deposits by the trustee might very justly be presumed to constitute a restoration of the depleted trust fund, in the absence of evidence to the contrary, such as that the additional deposits were funds belonging to other persons. But where the rights of general creditors of the trustee are involved, and the indulging of such presumption of restoration would have the effect of taking funds which would otherwise go into the general assets of the estate and be subjected to the claims of general creditors, it is well to pause and examine the ground for such action.

It must, however, be admitted as well settled that where a trustee wrongfully depletes a trust fund, it is his duty to restore it, if he can do so from his own funds and not from those of some one else; and the law generally presumes that a fiduciary does his duty in the absence of evidence to the contrary. This is the foundation of the presumption that where the trustee draws money from a commingled fund, he draws from his own portion first. Applying this presumption, and the reason underlying it, to the case at bar, it would appear that where, as here, the trustee bank has drawn so heavily against a mingled fund deposited with a particular bank as to partially deplete the trust fund contained in such mingled fund, and the very next day makes additional deposits of funds, the source of which is not shown by the evidence, more than sufficient to restore the trust fund, in the absence of evidence to the contrary such trustee will be presumed to have used its own funds, which it had the right to so use, for the purpose of restoring that portion of the trust fund which it had wrongfully withdrawn.

This has been very generally held in cases where the mingled fund was in the form of a bank deposit which was nominally a trust account, or treated and kept as a trust account, but we see no good reason why the principle should not be applied to an account kept by a trustee in his own name and in which he mingles trust funds with his own, especially where he draws the amount of such deposit down to a point below the amount of the trust, the only funds left in such deposit account being the remainder of the trust fund, as was the case here, and the restoration being made presumably with the trustee's own funds which he had the right to so use, there being no evidence to the contrary.

But here again the authorities are in conflict. In Section 828, Perry on Trusts, 7th Ed., it is said:

"Where the commingled fund has already been dissipated in part the claimant is not entitled to more than the balance although the wrongdoer later adds some of his own money to the fund unless such new addition may be considered as a restoration of the amount wrongfully withdrawn. There is no presumption to the effect that these subsequent additions by the trustee or wrong-doer of his own money are restorations of the trust funds. However, an actual intention that such additions should be by way of restoration will be effective if such an appropriation does not create a preference. Circumstantial as well as direct evidence is admissible to establish this intent to restore. If the mingled fund is in the form of a bank deposit which is nominally a trust account, or if the trustee has treated it as primarily a trust account, it has been held that the mere deposit of his own funds, after having drawn out trust money for his use, will be treated as a restora-

tion, a declaration of trust as to such deposits being implied from the circumstances.''

See also 26 R. C. L. 1358.

Our view, however, we think, is sustained by the reasoning of Duel v. Hollins, 241 U. S. 523, 60 Law Ed. 1143; Gorman v. Littlefield, 229 U. S. 19, 57 Law Ed. 1047, 33 Sup. Ct. R. 690, and Richardson v. Shaw, 209 U. S. 365, 52 Law Ed. 835, 28 Sup. Ct. R. 512, as well as by our own case of Glidden v. Gutelius, *supra*. In the cited case of Gorman v. Littlefield, it was said: ''Furthermore, it was the duty of the broker, if he sold the certificates (of stock) to use his own funds to keep the amount good, and this he could do without depleting his estate to the detriment of other creditors who had no property rights in the certificates held for particular customers. No creditor could justly demand that the estate be augmented by a wrongful conversion of the property of another in this manner, or the application to the general estate of property which never belonged to the bankrupt.'' And in Duel v. Hollins, *supra,* it was held that where a broker who holds stock bought for a customer wrongfully disposed of it, but later bought stock of the same sort, the trust would be applied to the new certificates thus subsequently acquired. This amounts to holding that he would be presumed to have restored by his later purchases the certificates thus wrongfully disposed of.

In the case of U. S. Nat'l Bank v. Weatherby, 75 N. Y. Sup. 3, 70 App. Div. 279, it was held that where a bank account was kept in the name of a firm and was used for deposit of funds collected for the account of two corporations for which the firm were agents, the withdrawals made by a member of the firm would be regarded as restored by subsequent deposits made of funds from some undisclosed

source, since the account, having been impressed with a trust, would continue so until the trust was discharged; that the withdrawals and restorations did not operate to extinguish the trust fund, since, the withdrawals being wrongful, the wrongdoer would be presumed to have intended the subsequent deposits as a restoration of the amounts wrongfully withdrawn. This doctrine is supported by Baker v. N. Y. National Exchange Bank, 100 N. Y. 31, 2 N. E. R. 452, which held that the fact that the deposit account also held the proceeds of the property of other persons would not necessarily preclude relief; and by Cohnfeld v. Tanenbaum, 176 N. Y. 126, 68 N. E. R. 141, 98 A. S. R. 653, in which a guardian's bank account kept in his name as guardian, had been depleted but subsequent deposits were made, wherein the court said: 'But if we assume that the guardian had embezzled the money, the obligation existed to make restitution, and his subsequent deposits from whatever sources received would be an appropriation of these moneys in satisfaction of his ward's claim against him. From such time they became the infant's moneys as against everyone except one who claiming the moneys could show that they had been wrongfully diverted.'' See also Cook v. Tullis, 18 Wall 322, 21 L. Ed. 933.

We conclude, therefore, that the subsequent deposits by the Palm Beach Bank & Trust Company in the Atlantic National Bank should under the evidence in this case be held to have restored the depleted trust fund, and as the funds to the credit of the trustee bank with the Atlantic National, coming into the hands of the receiver, were more than sufficient to cover the trust fund, the decree of the court below should be corrected so as to allow appellee's claim as a preferred claim for the full amount of said claim.

Affirmed in part, reversed in part, and remanded for correction of decree, and such other proceedings as may be necessary, consistent with the above opinion.

TERRELL, C. J., AND ELLIS, J., concur.

WHITFIELD, P. J., AND STRUM AND BUFORD, J. J., concur in the opinion and judgment.