In re FIRST FIDELITY FINANCIAL SERVICES, INC., Debtor.

Willa SCHIFTER, Plaintiff,

v.

FIRST FIDELITY FINANCIAL SERVICES, INC., Defendant.

In re FIRST FIDELITY FINANCIAL SERVICES, INC., Debtor.

Abe A. SCHULTZ, Plaintiff,

v.

A.W. BECK, Trustee, Defendant.

Bankruptcy No. 82–00637–BKC–JAG.

Adv. Nos. 82–0417–BKC–JAG, 82–0591–BKC–JAG–A.

United States Bankruptcy Court, S.D. Florida.

Oct. 18, 1983.

Chad P. Pugatch, Cooper, Shahady, Frazier & Pugatch, Fort Lauderdale, Fla., for trustee.

A.W. Beck, Plantation, Fla., trustee.

Steven Friedman, Britton, Cohen, Kaufman & Schantz, P.A., Miami, Fla., for Abe A. Schultz.

GASSEN, Bankruptcy Judge.

## FINDINGS AND CONCLUSIONS

The cases of Willa Schifter versus First Fidelity Financial Services and Abe Schultz versus the trustee have many factual differences, but ultimately turn on the same legal issue: whether or not a constructive trust can be imposed by this bankruptcy court in favor of these investors on property of the estate. Under the facts of the bankruptcy proceeding and the particular facts which these plaintiffs have been able to prove, the court concludes that the plaintiffs do not prevail.

## FACTS

Willa Schifter paid First Fidelity Financial Services $17,000 for an investment in a mortgage, with the stipulation that she be allowed to approve the specific mortgage before the assignment of it to her. She personally dealt with individuals at Balogh Securities. There was conflicting testimony about whether or not Balogh had commenced a merger with the debtor, but the evidence is clear that the Balogh personnel were acting as agents for First Fidelity in this transaction, and that the representations they made to Ms. Schifter were authorized by First Fidelity. Ms. Schifter's check for $17,030, ($30 was for the brokerage commission to Balogh,) was made payable to the First Fidelity Trust Account (Plaintiff's Exhibit No. 1).

The testimony of several witnesses, both pre-bankruptcy employees and post-bankruptcy management, make it clear that First Fidelity had a trust account for the deposit of funds received from investors. In fact, the title of the account was "Trust Account", as shown on bank statements (Plaintiff's Exhibit No. 7). However, the testimony and evidence also makes clear that the account was not treated exclusively as a trust fund, but was more nearly used as a general operating account. The testimony of William Planes, then chief operating officer of the debtor-in-possession and Defendants' Composite Exhibit D reveal that checks were written on the "trust" account not only to fund mortgages, but also for insurance, recording, intangible and documentary stamp taxes, brokerage commissions, payments on first mortgages (those senior to the First Fidelity mortgages), "interest" to investors whether or not mortgages had been assigned to them, mortgage payments forwarded to assignees, "consulting fees", payments to office personnel and substantial personal loans to Barry Nelson, then an officer of the debtor-corporation. The sources of funds to the account were also varied, so that other of the debtor's funds were commingled with the investors' funds.

A letter from Murray Stein, who had signed as vice-president of First Fidelity, acknowledged on behalf of First Fidelity the receipt of $17,000 from plaintiff Schifter, informed Ms. Schifter that the funds

were deposited in the trust account, and told her that they could be refunded within seven days until placed in a mortgage (Plaintiff's Exhibit No. 4). After a month, when she still had not received an assignment of mortgage, Ms. Schifter wrote, on March 24, 1982, asking for the return of her funds (Plaintiff's Exhibit No. 5). Her investment was not returned to her, but she did receive a check for $155.60 dated March 25, 1982 (Defendants' Exhibit B). This was for eighteen days' "interest" even though her money had not yet been placed in a mortgage.

Ms. Schifter's money was deposited on March 1, 1982, as shown on the deposit tickets (Plaintiff's Exhibit No. 6) and the bank statement (Plaintiff's Exhibit No. 7). On March 1, 1982 the ending balance in the "trust" account was $614,905.08. On April 8, 1982, the day before the bankruptcy, the closing balance was $98,887.64.

In addition to this account the debtor held real property and numerous mortgages which had not been assigned to other investors. At the time of the Schifter trial accountants for the debtor-in-possession had only begun to piece together the many financial and property records which had been left in shambles, both physically and from an accounting standpoint. In a subsequent hearing one of the accountants testified that the interrelated debtor companies had innumerable bank accounts which were opened and closed on an almost daily basis. Apparently funds were freely transferred among bank accounts, in and out of mortgages, and to and from investors.

There was no precise evidence as to other claims to the trust account. However, Planes testified that there were "a couple hundred" people in a position similar to Schifter in terms of having paid in investment funds without receiving an assignment of mortgage. He estimated that their claim totaled over $1,000,000.

Plaintiff Schifter's complaint sought modification of the automatic stay to permit her to proceed against the debtor in state court, and that relief was denied (C.P. No. 25).

The case of plaintiff Abe Schultz was submitted on stipulated facts, including a stipulation to the facts proved in the Schifter adversary case. Schultz is in a similar position to plaintiff Schifter in that he gave funds to First Fidelity and received no assignment of mortgage in return. In his case, however, there was an additional problem. He initially gave a check for $10,000 to Murray Stein on March 5, 1982. Then on March 7, 1982 he gave a second check to the debtor, with the understanding that the first would be returned. Instead, the debtor deposited both. Schultz seeks to have a trust impressed at a minimum as to one $10,000 amount because of the mistake which occurred, and because plaintiff had no intention of investing more than $10,000.

Each plaintiff here claims to be more than a mere creditor of the estate. Each seeks to have the court impose a trust in his or her favor in order that the property be excluded from the debtor's estate, as property in which the debtor has only bare legal title, and not the equitable interest pursuant to 11 U.S.C. § 541.

## LAW

From the testimony of witnesses in the Schifter trial, the court concludes that an express, although unwritten, trust existed in favor of each investor upon delivery of funds by the investor to First Fidelity. First Fidelity had established a trust account, and the court finds that it was the intention of all parties that investment funds were to be placed in that account and held in trust until used to fund or purchase mortgages which would be simultaneously assigned to the investors.

### The Tracing Requirement in the State Law of Constructive Trusts

The difficulty for investors is that the fund trustee, the debtor, failed to preserve the trust funds intact and separate from its own funds. This breach of fiduciary duty having occurred, the express trust no longer exists. Instead, the investors would have, at most, an interest in a con-

structic trust. There are many bases for the imposition of a constructive trust under state law, including fraud. However, a classic reason for the creation of a constructive trust is the misappropriation, misuse, conversion or commingling of trust property by a trustee (here, the debtor), so this court need not look for other grounds. See 33 Fla.Jur. "Trusts" § 72–78, and cases cited therein.

The reason for imposing a constructive trust is to avoid unjust enrichment to the recipient of the windfall, and to do equity for the party whose property has been misused. But a desire to do equity alone is not enough. The essence of the equitable remedy of imposing a constructive trust, as opposed to the legal remedy of damages, is the concept that the very property in question can be returned to its rightful owner. The law gradually broadened so that proceeds of the original property may be pursued, e.g., *Sewell v. Sewell Properties, Inc.,* 30 So.2d 361, 159 Fla. 570 (1947) but the basic requirement of tracing the original property, albeit in its various forms, remains an element of proof for constructive trusts. *Myers v. Matusek,* 125 So. 360, 98 Fla. 1126 (1929). Likewise, a consideration of the equities to all parties concerned is involved; the court may not focus solely on the equities from the standpoint of the person wronged. The precise conflict faced by this court was summarized in *Matusek,* 125 So. at 365:

> ... the right of a cestui que trust to reclaim trust funds in specie or impress the trust upon other property in the hands of the trustee ... is founded on the right of property and not on the ground of compensation for its loss, and hence the beneficiary of a trust fund is not entitled, solely because of the character of his claim, to the payment of the same in full out of the assets of the insolvent trustee's estate, to the exclusion of general creditors. On the other hand, general creditors have no right to have their claims paid out of property or its proceeds which never actually belonged to the insolvent trustee, if they can be

sufficiently identified or traced as to justify their separation from the corpus of the trustee's estate, and their return, in specie or in value, to the owner.

Although the tracing requirement is universally accepted, the interpretation of "tracing" varies among courts in cases where there was a commingling of the funds of one or more trust beneficiaries and the funds of the trustee. In many cases the "tracing" amounts to the application of legal presumptions, although it may not be labeled as such.

A summary of many such cases is found in the annotation, "Distribution of Funds Where Funds of More Than One Trust Have Been Commingled By Trustee and Balance is Insufficient to Satisfy All Trust Claims", 17 ALR 3d 937. Of the cases compiled in the annotation, the majority of those which involved a financial institution as trustee, where funds of the trustee were commingled with the funds of numerous trusts (express, implied, or constructive), reached the result that tracing was deemed insufficient and trust beneficiaries were treated simply as general creditors. The focus is specifically on tracing in Note, 13 Minn.L.Rev. 39 (1928). Among other conclusions, that author found that in cases of bank insolvency, the courts did not always strictly follow the law of trusts and were often very liberal in treating trust funds as traceable.

Another relevant point which is made by the commentators concerns the legal presumption that where a trustee has commingled trust funds with his own, and then removes funds, the remaining funds will be deemed to belong to the trust beneficiary. This legal fiction was based on the belief that a trustee would not further violate his fiduciary duty, and that the withdrawal from a commingled fund must have been a withdrawal of his own funds first. This logic led in many cases to variations of the lowest balance theory, where courts have applied a presumption that, in the case of insufficient funds, funds in the amount of the lowest balance after the deposit of the trust monies will be presumed to belong to

the trust beneficiary. This position has been validly criticized, however, when it is applied to benefit one beneficiary in situations involving a commingling of more than one trust in addition to the trustee's own funds. As was stated in *In re Mulligan,* 116 F. 715, 722 (D.Mass.1902), a bankruptcy case in which trust beneficiaries were held to have no greater rights to money in a bank account than the bankrupt's general creditors, and the petitioning beneficiary could not obtain the return of his funds on the theory that his trust funds remained untouched in the account:

> It may be reasonable that a trustee should be deemed to draw his checks against that part of a mingled account which is his own. It is unreasonable that he should be deemed to draw his checks with the invariable intent to defraud [one trust beneficiary] rather than [the other].

The rule repeatedly expressed in the Florida cases is that trust funds must be strictly traceable to particular property which is capable of clear identification. The result, however, in bank insolvency cases has been that trust beneficiaries have prevailed in having a trust impressed on the remaining funds or property of the banks, to the detriment of general depositors and general creditors. *Glidden v. Gutelius,* 119 So. 140, 96 Fla. 834 (1928); *Myers v. Matusek,* 98 Fla. 1126, 125 So. 360; *First State Trust & Savings Bank v. Therrell,* 138 So. 733, 103 Fla. 1136 (1932). See also *Wilkins v. Wilkins,* 144 Fla. 590, 198 So. 335 (1940). In *Therrell,* the court ruled that an individual beneficiary had not traced her own trust funds sufficiently to take priority over other trust beneficiaries, and one class of beneficiaries had no greater right than another to particular funds, but the court nevertheless found that the trust beneficiaries as a group satisfied the tracing requirements so as to have a right to the remaining bank funds and property ahead of general depositors.

The Glidden and Therrell courts acknowledged the harmful effect of this result on general creditors, and the need to consider their conclusions very carefully.

## Constructive Trusts in Bankruptcy

■ The question before this court is whether plaintiffs have sufficiently traced their funds so that imposition of a constructive trust is appropriate and the equitable interest never comes into the bankruptcy estate. The issue at this time is not one of priorities among classes of creditors or rights upon distribution. However, it is obvious that the legal fiction of a constructive trust has as its effect a rearranging of priorities among claimants, whatever the basis of their claims. It is for this reason that it is a federal question whether or not a constructive trust may attach to the general funds in bankruptcy where it is difficult to trace the specific property. See *Wisconsin v. Reese, In re Kennedy & Cohen, Inc.,* 612 F.2d 963, 6 B.C.D. 128 (5th Cir. 1980), (adopted as authority for the 11th Circuit through *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981). See 4 Collier on Bankruptcy ¶ 541.13 (15th ed).

The capstone of the federal cases on the tracing issue is *U.S. v. Randall,* 401 U.S. 513, 91 S.Ct. 991, 28 L.Ed.2d 273 (1971), in which no constructive trust was imposed. In that case a debtor-in-possession under Chapter XI of the Bankruptcy Act was ordered to maintain a separate bank account for payroll tax obligations. The debtor withheld income and social security taxes from the wages of its employees, but never deposited them into the separate account. Upon later liquidation, the I.R.S. argued that the withheld taxes were not property of the bankruptcy estate, but were held in trust under Internal Revenue Code provisions, and that the amount of those taxes should therefore be paid to the I.R.S. ahead of distribution to anyone else. The Supreme Court disagreed, saying that such a ruling would defeat the expressed priorities of bankruptcy law, which place taxes in a lower position than administrative expenses. The court concluded that the specific priorities of bankruptcy law preempt other general federal statutes defining priorities in various situations, and also that a literal reading of the tax provision would subordinate any trust fund to the lower

priority which bankruptcy law gives to taxes. The conflict in *Randall* was between the I.R.S. (for taxes accrued while the debtor was in possession in the Chapter XI proceeding) and the trustee seeking administrative expenses in the subsequent liquidation proceeding. (Administrative expenses of an ensuing bankruptcy proceeding have priority over expenses and claims of a superseded proceeding.) Nevertheless, the court commented:

> We think the statutory policy of subordinating taxes to costs and expenses of administration would not be served by creating or enforcing trusts which eat up an estate, leaving little or nothing for creditors and court officers whose goods and services created the assets.

401 U.S. at 517, 91 S.Ct. at 994, 28 L.Ed.2d at 276.

The Randall case has been followed by a number of courts where similar tax or other statutory trusts are involved. E.g., *In re Tamasha Town and Country Club,* 483 F.2d 1377 (9th Cir.1973). These cases could be distinguished because such statutory trust situations are arguably entirely different from the equitable constructive trusts which might be imposed here. However, *Randall* has been applied in pure constructive trust situations, where tracing was the issue. In particular, in the *Kennedy & Cohen* decision, which is binding on this court as a former 5th Circuit case, it was held that under federal law plaintiffs must be able to trace their funds to an identifiable trust in the hands of the trustee. The injured parties there were customers of the debtor, and plaintiffs in that case sought the imposition of constructive trusts to preserve maintenance contract fees which had been paid to the debtor, and which the debtor had not segregated. The opinion makes clear that, whether the asserted trust is a constructive trust under liberal state law tracing requirements or an express trust which cannot be traced to specific assets, it is a federal question whether a trust will attach to funds in *bankruptcy.* Following *Randall,* the court's concern was that permitting such a trust to attach to

general funds would be merely rearranging the priorities of bankruptcy distribution.

█ Although the principle of federal preemption stands, it is arguable that the standard to be applied in gauging whether or not there is sufficient tracing should be modified to conform to Congressional intent embodied in the new Bankruptcy Code. See discussion in *Selby v. Ford Motor Company,* 590 F.2d 642 at notes 6 and 16 (6th Cir.1979). The legislative history of § 541 reflects that a proposed Senate amendment included a provision that property of the estate does not include taxes withheld by the debtor or collected from others before the commencement of the case. This was deleted as unnecessary because an estate does not include property held by the debtor only as a trustee, and the Internal Revenue Code provides that withheld taxes are to be held in a special trust fund. The additional comment was added:

> Nonetheless, a serious problem exists where "trust fund taxes" withheld from others are held to be property of the estate where the withheld amounts are commingled with other assets of the debtor. The courts should permit the use of reasonable assumptions under which the Internal Revenue Service, and other tax authorities, can demonstrate that amounts of withheld taxes are still in the possession of the debtor at the commencement of the case. For example, where the debtor had commingled that amount of withheld taxes in his general checking account, it might be reasonable to assume that any remaining amounts in that account on the commencement of the case are the withheld taxes.

124 Cong.Rec. H11,114; S17,430–1 (1978). This indicates the legislative intent that courts be liberal in tracing tax "trust funds" which have been commingled with the debtor's funds.

### APPLICATION OF LAW TO FACTS

Turning to the facts in these adversary proceedings, the court concludes that no constructive trust can be imposed. Ms. Schifter places much emphasis on the fact

that she tried to be extremely careful in the placement of her funds, and that this unique relationship with First Fidelity places her in a more favorable position for the court to do equity. As stated above, the court has concluded that her money went into an express trust. No facts surrounding her delivery of the funds can put her in a better position than that. The problem comes in what happened to the money after it was placed in that account, and the inability of Ms. Schifter to trace her particular trust funds further.

Similarly, Abe Schultz argues that he is in a better position than other investors because of the mistake which occurred when the debtor negotiated both of his $10,-000 checks instead of only one. The court accepts his resulting trust argument if it is necessary to a finding that the entire $20,-000 went into the same express trust. However, he also has the same problem as plaintiff Schifter when it comes to tracing. This court adopts the reasoning of *First National Bank of Louisville v. Hurricane Elkhorn Coal Corp.,* 19 B.R. 609 (Bkrtcy.Ct. W.D.Ky.1982) in which the court refused to impose a constructive trust in favor of a plaintiff who had mistakenly paid over $84,-650 to the debtor prior to bankruptcy, stating that plaintiff had offered no evidence that the money erroneously overpaid was still in the debtor's hands at the time of bankruptcy.

Ms. Schifter urges that, since her payment to First Fidelity was $17,000, and there was at least $17,000 remaining in the trust account at the time of bankruptcy, she has sufficiently traced her funds in order to impose a constructive trust. This court disagrees with Ms. Schifter and agrees with the courts which say that that standard should not be used where the funds of several beneficiaries are commingled. The trust fund amount to be used as the standard here must be the aggregate of all the trusts, not the amount of the deposit of the first to the courthouse. This is even more necessary in bankruptcy court, where the court has the obligation to do equity for all claimants in the estate to the extent it is possible to do so, and within the standards set down by bankruptcy statutes. Viewed in this light, the balance in the First Fidelity trust account at the time of bankruptcy was far lower than the aggregate of trust monies in the account at the time of plaintiffs' deposits. Thus it cannot be concluded that the trust funds of Ms. Schifter or of Mr. Schultz remain in the account. It is true that some of the withdrawals from the account subsequent to the deposit of their funds may have been legitimate withdrawals on behalf of investors (trust fund beneficiaries) whose funds were formerly part of the aggregate but who no longer have any claim on the balance of the trust funds. But there was no evidence that this was the case as to the totality of the withdrawals, and, in fact, the evidence was to the contrary. As phrased by the court in *Therrell,* 138 So. at 738, "the commingled fund represents an inextricable compound that no alchemist would dare the attempt to unscramble."

As in some of the other bankruptcy cases facing this issue, the court cannot ignore the fact that it has been necessary to expend substantial administrative expense to sort out the records at all. Without that expenditure no one would get anything unless the claimants had contributed the cost themselves. This is a factor which it is appropriate for a bankruptcy court to consider in deciding whether or not a constructive trust should be imposed in the first place. Balancing all aspects of the situation, the court concludes that it is not appropriate for it to indulge in a legal fiction as a substitute for a tracing of plaintiffs' actual funds, in order to impose a constructive trust.

■ Unfortunately for plaintiffs, not every wrong can be righted by a remedy in equity. If a wrongdoer dissipates the assets of another, no constructive trust can be imposed because there is no property on which to impose the trust. This court, in effect, concludes that plaintiffs have not proven that their property was *not* dissipated and have failed to carry their burden of

proving all the elements of a constructive trust.

Pursuant to Bankruptcy Rule 9021(a), a separate Final Judgment incorporating these Findings and Conclusions is being entered this date.